We'll hear argument first this morning in Case 16-1094, Republic of Sudan v. Harrison. Mr. Curran? Mr. Chief Justice, and may it please the Court, when we're talking about a mailing and a requirement that the mailing be addressed and dispatched to a specified person, we naturally understand that to require that the mailing bear the address of the person and be sent to that address. That plain meaning of 1608A3 is reinforced by other features of the FSIA's service provisions. Specifically, when Congress intended there to be an intermediary between the sender and the ultimate recipient, it said so. It said that in A4, where it addressed service through the U.S. Secretary of State. It said that in B2, where it authorized the service through an agent in the United States. No counterpart in A3. I have to say, if my first instinct, if I wanted to mail something to the head or cabinet member in a foreign country, that would be my first thought. Why don't I deliver it to the embassy? Other than the idea of mailing it to the foreign minister in some country and assuming it's going to get there in a reasonable time, I think you're much more likely to reach him through the embassy. Well, I don't think that can be squared with the plain language of 1608A3 or, again, the surrounding provisions of the FSIA's service provisions. A foreign minister, the head of the Ministry of Foreign Affairs, does not have an office in the diplomatic missions. So it literally would not be complying with the statutory language to send the mailing to that diplomatic mission. Suppose somebody sent you a letter addressed to the White and Case office in New York City. I bet that would get to you, wouldn't it? It might get to me. Yeah, it should. Would that not be addressed to you? I don't think it would be addressed and dispatched to me, no. My address is always held out as 701 13th Street, Washington, D.C. So that might get to me, but it wouldn't be compliant with a statutory requirement like we see in A3. And, Justice Alito, furthermore, 1608C with the return receipt requirement, how would that square if a package was sent to me in New York City? Would the recipient up there in the mailroom sign the return receipt? That hardly guarantees, that's hardly proof of delivery to the ultimate recipient when it's going through an intermediary in that manner. But it just – I'm not so sure that the addressed and dispatched language do the trick for you. I mean, if you went to any U.S. embassy around the world, I think you would see posted – you would see mounted on the wall a picture of the Secretary of State, which signifies, in a sense, that the Secretary – this is under the jurisdiction of the Department of State. Under the jurisdiction – well, Justice Alito, I guess I would draw an analogy. I don't know what circuits you're the circuit justice for, probably the Third Circuit, perhaps. Would a package sent to a Federal District Court in New Jersey be addressed and dispatched to Your Honor? I think not. Particularly if it's accompanied by a requirement that it be a return receipt, that would be evidence of – Yeah, it might not be. But when I was on the Third Circuit, my office was in Newark, but the headquarters of the court was in Philadelphia. And I used to get mail that was addressed to me, U.S. Court of Appeals, Market Street, Philadelphia. Yeah. We're talking about a statutory provision that has to be applied literally and strictly. I say strictly because the provision of 1608A, unlike B, and particularly B-3, doesn't say actual notice does it or anything like that. And the circuit courts have concluded almost uniformly that 1608A requires strict compliance. It's certainly not strict compliance to address a package to Newark for a Third Circuit. But, Mr. Kern, I guess I'm wondering, the statutory language does not say at his own office. And in the absence of that kind of language, I suppose this is maybe what the Chief Justice was gesturing towards, too, that there seems something special about the embassy situation that's not like one of these Third Circuit situations. It's just everybody understands that embassies are supposed to be the point of contact if you want to do anything with respect to a foreign government. I don't agree with that. I think anyone who's informed or looks into it would conclude that the embassies are there to serve as diplomatic functions, not to be a catch-all recipient for service or process or other things being sent to the foreign State. We'll get into the Vienna Convention in a bit, but the diplomatic missions have a very specified and limited role. And it's — and there's no suggestion in law or the U.N. Conventions or otherwise that it's there to — for the convenience of plaintiffs. Ginsburg. What would, in fact, happen? Was this notice sent to the foreign minister? Well, that's a — it's complicated, right? It was — it named a former foreign minister, and it said it was being sent to the Ministry of Foreign Affairs, but it was addressed and dispatched to the Sudanese embassy here in Washington, D.C., on Massachusetts Avenue. My question was, did the foreign minister, the addressee, receive this notice? There's nothing in the record that tells us that he did. You say this was not — the embassies are not there for the convenience of — of people wanting to sue or plaintiffs. They're there for the convenience of the host — or the country, Sudan in this case, right? And to facilitate diplomatic communications between the countries. I would have thought it would be much more — I mean, they tell us not. I would have thought it would be much more convenient for them to get notice that they're going to be sued in the United States, at the United States embassy. I mean, I would have thought otherwise it's — you know, who knows, it's going to get lost, or much more likely for them to hear about it if you give it to the embassy here. Yeah. I think that the amicus briefs that Your Honor has received, that this Court has received from foreign states, suggest otherwise. In fact, I think the reality is a foreign ambassador located in Washington, D.C., gets flummoxed at the prospect of receiving service of process, doesn't know what to do with it, doesn't know what it's all about. They're generally not lawyers. Flummoxed? Flummoxed. The — and somebody in Khartoum isn't? As someone in Khartoum knows, ah, this is the kind of thing we see from time to time, we better get this to our legal team, the legal advisors team, or the Justice Department across the street, they do have a full panoply of expertise there. These — many of these diplomatic missions in Washington are skeleton staffs with an ambassador, one or two assistants, and a staff generally of people of nationalities different from the sending country. May I ask you, the address and dispatch concept, much of the brief was centered around that being where the minister sits in the capital of the foreign state. But there are many countries where the foreign minister doesn't necessarily sit in the capital. Or let's assume an emergency. Something's happened at that minister's seat, and he's now sitting in a nearby building or in another city within the state. Or even he's decided he's going to come and spend three months in the United States. It's one of these ministers who thinks he should visit all foreign countries for an extended period. Is address and dispatch to his home in the foreign state, to his normal place of business? What's — how do we define it? If I'm writing this opinion, because I don't actually think you mean to say, to add a phrase. I don't mean to add a phrase. At the foreign state's ministry or something. Where the foreign minister has an address, it's got to be sent. Now, I think the fair reading, when it says head of the foreign — of the ministry of foreign affairs, that's implying an official address and not a home address. But if — by the way, based on my research, there aren't many countries that have a minister of foreign affairs not in the state capital. I think there are about three. But let's use an example. Let's take South Africa, where the minister of foreign affairs has offices in both Pretoria and Cape Town. But coincidentally, there's also a single mailing address. But in that situation, I think it would be perfectly acceptable for the package to be sent to any one of those addresses, because they are all addresses of the — of the head of the foreign ministry. It's strictly a factual question, where is the address of the foreign minister? And — What is his or her official address? Is that it? I think it should be the official address. But again, here it wasn't sent to any address of the foreign minister. When this statute was enacted, do you think Congress thought that sending something, return receipt requested to Khartoum, for example, was — was a simple thing? It would be like sending something, return receipt requested to — I don't know where — someplace in the United States. Yeah. Well, we have — we have a rich record of the legislative history here, so we know a lot about what Congress — or maybe more accurately, the State Department and the Department of Justice thought when they were drafting the statute in the mid-'70s. On that point, Congress recognized that in many situations, that return receipt might not be coming back, either due to problems with the mail system or a declination of signing it in the foreign country. But Congress was — was strategic. And this hierarchy they set up in 1608A has gotten number four, which is a fail-safe option that is always available, can never be rejected. I'm just asking about the practicalities of this. So I assume it would be — this is before the era of FedEx and all that. So was there a simple way to do this with the U.S. Postal Service? Yes. You send a return receipt requested and it comes back from the far reaches of the world? Yes, but it did require the cooperation of the mail service in the foreign country. And the reliability of that wasn't always assured, for sure, because there are over a hundred foreign countries that this thing could be mailed to. But again, there's the catchall. And speaking of the legislative history here, it powerfully confirms what I propose is the natural reading of 1608A.3, because Congress in the initial draft that, again, was sponsored by the Department of State, contemplated delivery of the service package to the embassy in Washington, addressed to the ambassador or other head of the mission. And that led to an immediate concern that it was transgressing the Vienna Convention and the inviolability of diplomatic missions. And Congress and the Department of State therefore changed the statute to avoid any connection with the local embassy to service a process. And this is all spelled out. They issued a circular to every diplomatic mission in Washington in 1974 saying, hey, we've got this draft bill. It talks about delivery to the ambassador. We're going to change that, because we are aware of the concerns about the Vienna Convention. And yet when the question came up to a sister nation, the U.K., they said the Vienna Convention doesn't prohibit. Yes. Your Honor is probably referring to the Reyes case. Yes. But that case is quite different. That case did not involve service on a foreign mission. It involved service on the residency of a diplomatic agent who was then no longer in service and who did not enjoy immunity. And there was no other way to serve that former diplomatic agent. And in the U.K. Supreme Court decision, the Court expressly distinguished the situation with a service on a foreign state or the mission of a foreign state saying that that was precluded by Section 12 of the U.K.'s 1978 immunity statute. So I don't think the Reyes case is persuasive on the question we're addressing. But Congress purposefully changed the bill that became the FSIA to avoid any transgression of the inviolability of the diplomatic mission. And the reports, the parallel reports, the House report and the Senate report are both very express in saying we're changing the statute to avoid the Vienna Convention problem, and that's why there's no delivery. But on that, the U.K. decision did speak to the inviolability, they said. Inviolability doesn't mean sending mail. It means intruding into the premises, let's say, having a police officer with an arrest warrant or a search warrant. That's what the inviolability of the mission. I agree. I agree that the logic of the U.K. Supreme Court's decision is problematic with respect to the Vienna Convention. But I think the U.K. Court felt that it was boxed in with some bad facts and that it had to provide a way to have service of process against that former diplomatic agent. Kagan. If I could take you back, Mr. Curran, to the text of the statute, I mean, one of the notable things about 1608a-4, which is not replicated in 1608a-3, is that 1608a-4 does specify an address. You know, it says, addressed and dispatched by the clerk of the court to the Secretary of State in Washington, D.C. And 1608a-3 does not say, at his office in the Sudan. Correct. So the question is, what inference do we draw from that contrast? And I submit that the proper inference to draw is it confirms that everybody's thinking that the foreign minister gets served, whether it's the U.S. Secretary of State or the foreign foreign minister, they're all getting served in their official offices in their home capital. I think it confirms that. Also, and this might sound a little strange, but the question  D.C.? I guess I don't really quite understand that, because here they clearly thought that they had to specify when they wanted to specify, you know, at his office on — in Washington, D.C. Yeah, but they didn't say C Street in Foggy Bottom, right? Well, close enough. Yeah, but under the plaintiff's theory, oh, if it's not precluded, then any other indirect method of service is okay, too. So maybe you can send it to the White House knowing that Secretary Pompeo visits there occasionally. I don't think that's the answer. But furthermore, the 1973 legislative history suggests that at that time, pre-FSIA, some courts were analogizing service on a foreign state with service on a foreign corporation. There's even a decision by the Second Circuit, you know, that has Judge Friendly on the court that reaches that exact conclusion, that it's — the analogy is to a foreign corporation. Well, that concern and the possibility that someone could try to serve a foreign corporation through a U.S. State secretary of State was a legitimate concern at the time and may have motivated the further specification that we're talking about the Secretary of State in Washington, D.C., not a Secretary of State in Austin, Texas. And as Your Honor, I think that's fair to say, as Your Honor may know, in the Magnus case, that's exactly what the plaintiffs tried to do. They tried to serve process on a foreign state through the Texas Secretary of State in Austin. So Congress may have been trying to clarify that that's not acceptable. Now, on the Vienna Convention, there's one other point I'd like to make. The scholars that we've cited and the case law that we've cited indicate that inviolability also addresses any effort to assert the right to serve jurisdiction at a diplomatic mission. We think that's pretty established. Now, our friends suggest that we perhaps were — and maybe the S.G.'s office as well — were trying to obscure the 1958 commentary which suggested that service could be done by mail compliant with the Vienna Convention. I reject any suggestion we were obscuring anything. Our brief addresses in great depth the Japanese proposal voiced by Mr. Takahashi that was proposing that the actual text of the Vienna Convention, Article 22, be changed to allow service by mail. That proposal was roundly rejected. It was withdrawn and never adopted. So the language of Article 22 as adopted by — at the Vienna Convention, by the committee of the whole, indicates that the — the attendees at the convention recognized that service by mail would be a transgression of a foreign minister's inviolability — of a foreign mission's inviolability. Mr. Chief Justice, I'd like to — unless there are other questions, I'd like to reserve the rest of my time for rebuttal. Thank you, Mr. Kern. Ms. Ross. Mr. Chief Justice, and may it please the Court. I'd like to start off where Mr. Kern left off, which is how other States understood the Vienna Convention when it was actually enacted. I think we — we see this through, as he also mentioned, the legislative history and really the drafting history of the FSIA itself, because when Congress considered this issue, this very issue, it initially had service by mail to an ambassador, which everyone understood to be service by mail to the embassy in the first draft of the FSIA, and that was, in fact, rejected, as Mr. Kern noted, precisely because of this concern of inconsistency with the Vienna Convention. And the way that Congress knew that there was this concern was that other States, in fact, came to the State Department and said that this was a problem, and that's where you get the 1974 statement to the missions at Washington, D.C. that Mr. Kern also referred to. Now, I think there is — Alito, if the Court were to rule against you on this, how would the interests of the United States be harmed? Your Honor, Justice Alito, I'm glad you asked that question. That's exactly where I was going to go next, which is that the United States does not accept service by mail on one of its embassies abroad, and that is true even if a mailroom employee signs for the package. So in that instance, the United States sends back a diplomatic note. It informs the sender that we do not consider that to be proper service under international law. We will not be appearing in court, and we will not be honoring a default judgment. Why is — go ahead. Why doesn't it? Why doesn't the United States accept it? What's the harm? So the United States doesn't accept it, Your Honor, because it's not consistent with the Vienna Convention and with international law more generally. But is there a more particular harm that comes from accepting it at an embassy? Your Honor, I think there is an administrability harm. Now, of course, I think the violation of international law is itself sufficient, but even moving on from that, I think that the harm is that the United States has embassies all over the world, obviously, and sort of deputizing each of those to accept service on behalf of the United States is quite problematic. It's even more problematic if you accept a standard like the one that my friend suggests at page 34 of their brief, which is that service would be permissible at any place likely to have a direct connection to the foreign ministry. That would open up consulates. For example, there are countries that have 40 consulates in the United States, and so if similar treatment were extended to the United States abroad, you could see that there would be a variety of places where service would be made, and that obviously from an administrability standpoint is quite problematic. Alito, I still don't quite understand it in practical terms, although I see your point about the consulates. But say that the United States is sued in Germany, and if process is served on the embassy in Germany, I assume that the embassy there would promptly send it to the State Department in Washington. But I also suspect that the State Department in Washington would send it back to the embassy in Germany to – because if it was necessary to go into a German court, somebody would have to find attorneys to go into the court to represent the United States in the foreign country. Justice Alito, I'm not sure that's actually how it would work in practice. How would it work? So my understanding, Your Honor, is that the Office of Foreign Litigation actually in Washington, D.C. oversees all of that foreign litigation, and so it makes perfect sense in our system that we would want that to be coming to the Secretary of State in Washington, D.C., if at all. And in that case, under diplomatic note, rather than through direct mail service. But I think it's important to note that all of these questions sort of get to this idea that, well, it might make sense for service on an embassy. Maybe that will, in fact, reach the foreign minister. But I think in addition to the textual point that Mr. Curran made, which is in subsection B2 of the statute, when Congress expected an agent to accept service in the United States, that was actually spelled out in the statute. It's also true that in subsection B3, again, another provision governing foreign agencies and instrumentalities but not governing foreign states, there is a provision for methods of service that are reasonably calculated to provide actual notice. And so I think when Congress wanted a looser sort of whatever will actually get it back to the intended recipient standard, it actually said so. And we see that, again, in subsection B3. I would also point out that there was some discussion about subsection A4 of the statute. Now, I think Mr. Curran spoke about the many reasons why Congress might have included Washington, D.C. in A4 without the similar statement or express statement in A3. I would also just note that in the prior draft of the legislation that we've been discussing this morning, the service was to be made on an ambassador rather than or did not expressly say on the embassy, but everyone understood that to be where it would be, and that's, in fact, why other nations raised objections to the United States and why the United States asked or why the State Department suggested a change to the statute. And so I think similarly, it sort of makes sense in the evolution of the statute to understand that when Congress moved service from the ambassador, which was understood to be at the embassy, quite literally across oceans to the foreign minister, it was more than at the embassy in the United States, again, because that's something that was specifically rejected. Sotomayor, you say go ahead. Sotomayor, as I understand it, 1608 is already a lower bar than what the United States itself asks for when it is sued or what other nations ask for when they're sued. So it's already a different process than, a lower process than what's normally acceptable. So what difference does it make that it's different than what you do now? So, Your Honor, two responses to that, one practical, one legal. My practical understanding is that attempted service by mail to the United States embassies abroad happens nearly every day, and so that is actually a very large concern for us as a practical matter, whereas attempted service by mail to the State Department is actually much less frequent, just on the practicalities. As a legal matter, obviously we think that the United States has a reciprocity interest in having foreign litigants or foreign sovereigns brought into our courts only under the same circumstances that we ask abroad. I don't think that there is a way to read B-3 that doesn't permit service by mail to the foreign state, to the foreign ministry in the foreign state, and so I think our reciprocity interests really come in where we think the text is clear under A-3 that you can't serve on an embassy. But if, you know, there's any ambiguity there, that's where we think our reciprocity interests should be brought to bear. I would note more generally I think the United States' interests here are not only in reciprocity, they're also in consistency and predictability, which is something that this Court noted in Helmerich is especially important in the context of foreign sovereign immunity, because we are bringing foreign sovereigns into our courts. Roberts. If I could ask you to pause just for a moment. You say in your brief on the Vienna Convention that foreign nations would be affronted by sending a letter, someone sending a letter to their embassy. I just don't understand. I understand the idea that they don't want police officers coming and knocking on the door and saying I've got a search warrant or whatever, but it's hard to imagine someone's reaction to getting a letter in the mail to be that they're affronted by it. Mr. Chief Justice, I don't think this is an ordinary letter. This is a jurisdiction asserting summons. It's quite literally the sovereign of the United States sort of exerting its hand into the embassy and saying you better show up in court or we're going to enter a default sentence. It's not literally them inserting their hand. It's putting the letter in the mail box, the mail, right? Your Honor, again, I think it's not just a regular letter. It is a letter that has or a summons that has very serious judicial consequences. And so I think it is not just your regular drop-off of mail. But I think that we can do that. But why is it any more of an affront if you send it to one place than if you send it to the other? Well, Justice Kagan, the foreign minister or the foreign ministry abroad is not protected by the Vienna Convention, and so there isn't this idea that you have inviolability of those premises. So that is the way that States are more likely to expect to get the service, particularly an A-4 was discussed earlier, if it comes through diplomatic channels under A-4. It's a regulation that suggests that the State Department under A-4 can serve to the requests or, if otherwise appropriate. So is that also a violation of the Vienna Convention? It's not, Your Honor. Two points on that. The first is that under – again, as a practical matter, that happens quite infrequently. That is really in extreme circumstances where we either don't have an embassy abroad and don't have a protecting power that can deliver the summons. But on the legal matter, under Vienna Convention Article 41, Section 2, diplomatic channels, which are a well-established way of States communicating with each other, never violate admission inviolability. So that simply isn't a concern. And I think this is an important point, that A-4 is both always available and never a violation of diplomatic immunity. So it is not as though Respondents will not be able to ultimately complete service in this case or in any case. It is simply a question of how that service is, in fact, delivered. And again, we think on – How does that work mechanically, the A-4? Also, there's a request for the Secretary to send those, what used to be called a letterogatory. Is that what it is? Well, so what would happen in practice, Justice Ginsburg, is that the litigant would ask the State Department to serve abroad. It would have to show that it had not – that A-1 and A-2 were not available and that service under A-3 was not successful, meaning that the return receipt did not come back. And then the State Department, in the usual case, will send the materials after ensuring that they are correct or, you know, satisfy all the statutory requirements, will send those materials to the United States Embassy abroad, which will in turn transmit it to the foreign ministry in the foreign state. Thank you, counsel. Thank you. Mr. Shanmugam. Thank you, Mr. Chief Justice, and may it please the Court. Sudan seeks to reverse a $300 million judgment in favor of the USS Cole victims based on an unstated procedural requirement. Sudan argues that the Cole victims improperly served their complaint by sending it to the Sudanese Embassy, a component of the foreign ministry, where it was signed for and accepted. The relevant provision of the FSIA does not contain Sudan's requirement that the complaint be sent to the address of the headquarters of the foreign ministry in the foreign state. And even if the relevant provision were ambiguous, Sudan's proposed interpretation is not necessary to comply with the Vienna Convention, which does not prohibit service by mail at an embassy. Consistent with the plain language of the FSIA, the court of appeals correctly held that service in this case was proper and its judgment should be affirmed. I'd like to start. I've done a little bit of research on the service of process rules in the 50 States. And in virtually every one of them, in some manner or form, it basically says serve the person or the entity where they live, where they're doing business. Now, you would say this is doing business in the embassy, but since it's being addressed to the foreign minister, he is not physically there except for an occasional visit. It seems a natural understanding under most due process concerns that you serve the person where you're likely to find them. And that's not at most embassies except in the rare visits, which are very big state things. So I'm not sure that you can avoid reading addressed and dispatched. As having some sense that this is a place where this person is regularly to be found, not merely where his entity has, does some transactional business occasionally. Justice Sotomayor, I take your point about State service rules, but I think that that cuts in our favor and not against us. In our brief at page 23, we cite a number of Federal provisions that are to the same effect, that in a wide range of contexts, ranging from FDA notices to the Long Shoreman's Act, various Federal statutes and rules specify places where documents should be served. They specify residences or businesses or last known addresses. And in fact, Federal Rule 4I1B specifies that service of documents on the United States should go to the Attorney General of the United States at Washington,  D.C. And so it certainly is true that ordinarily one would serve documents at, you know, a home or an official address. But ordinarily, that address is specified. And where it is not specified, our submission here is a quite modest, straightforward textual one. It is that the embassy is an official address of the Foreign Ministry. It is a component, an extension of the Foreign Ministry. It is certainly true, as Justice Alito suggested, that if you walk into any American embassy, you are likely to see a picture of the Secretary of State. If you go to their website, you will see the seal of the Secretary of State. If you go to the website of the State of the Union. Sotomayor, but we can't ignore that it's not the place where the person usually is. And that concept, I think, is the essence of due process. But I don't think that you can get that out of the phrase addressed and dispatched. I think that the outer bounds of due process. Well, addressed and dispatched has a very sense of urgency. You're going to send it to the person, and not to some far distant place from where that person may be on occasion. But, Justice Sotomayor, as you are well aware, the outer bound of due process, the familiar Millane standard, is the notion that it must be reasonably calculated to give notice. And our standard gives effect to that, because if you will be aware from our brief, we think that the phrase addressed and dispatched requires the service pack to be sent in an expeditious manner. Sotomayor, isn't it strange to think that we have the Vienna Convention that protects the embassy from a service processor knocking on the door and hand-delivering something, but you can go in by mail and place a burden on the embassy by requiring either that it put it in its diplomatic pouch or hand-deliver it to the embassy or do something else, do the mailing for you to the foreign minister? Isn't that the exact kind of burden that the Convention was intended to avoid? I do not think that there is anything strange about the distinction between a process server on the one hand and service by mail on the other. If you take a look at the critical piece of drafting history, the 1958 revised commentary, which really is the definitive commentary of the International Law Committee on the Vienna Convention, in the paragraph on which we rely, the very paragraph, they draw precisely this distinction. And the reason I would submit that they draw this distinction, and this is also captured in Lord Sumption's opinion for the U.K. Supreme Court in Reyes, is that there is something relating to dignitary interests about personal service, the notion that some person is going to turn up at the embassy or skulk around at the embassy and wait for someone to arrive so that they can hand them a document. That interferes with the functions of the embassy in a way that a mailing does not. Breyer. But I have a question, and it's – Sumption's a good judge, and so I read that and paid attention to that. But I agree with you, it's textual. That's your argument. And I find it ambiguous, so we'll assume it's ambiguous. I look to purpose, just as Sotomayor did, and I cut that a little against you, because you'd mentioned – left one word out of your beginning. You said you want a $300 million judgment. You left out the word default. It was a default judgment. And, of course, that's the concern. That's the purpose concern, that they have one ambassador, an assistant, and four people working in the mailroom who are all American citizens, never even been to the embassy, and they don't know what to do. And you only have 60 days to answer. Okay? And so who knows what's going to happen to that piece of paper in many embassies more than 60 days before they even get it over in their country. All right. But purpose, I'll give you something on that, because that's not my question. Then I thought, well, can't get too far on purpose. Not sure about consequences. What about history and tradition? And there I asked my law clerk to go look up what other countries do. And this is what I found. I found, of course, we have five here, Austria, Libya, Saudi Arabia, the U.A.R. and the Sudan. They all say, we do it the State Department's way. Then Canada, the same. Belgium, the same. Twenty-two countries have signed a convention which says in the absence of an existing agreement, service on a foreign country must be to the Ministry of Foreign Affairs. Okay? So we got 22 more. And then I tried to find one the other way. Couldn't find one. Well, assumption. And what assumption was about is what he said. It was about a former ambassador of service in his residence. And they say foreign states are different. And then there's some language that helps you. And then I looked at what we did here. And what we did here is the Congress wanted to do it your way. And State wrote them a letter. And nobody says that that Vienna Convention on inviability is clearly yours or clearly theirs. What they say is there's an issue about it. And there is an issue. And because there is an issue, they said to Congress, the State, don't do it. This isn't the way we do it. And after the State wrote them that letter, they changed the law. They dropped the language that said you can serve in embassy. Okay? So, so far I have U.S. history. I have at least 22 to 27 countries. I could find nothing the other way except arguable dictum in a case that involves something else. Now, I put that long question to you because I want to give you a chance to say, no, I'm wrong. There are 32 countries who do it differently, or whatever you want to say. Well, I'm not going to say you're wrong, Justice Breyer. But I will address what I think were really the three parts of your question, first text, second policy, and third, the practice of other countries. So with regard to the text, as you know, our submission is quite simple. It's not that this is an ambiguous provision. It's that it's a broad provision. And the best evidence of that is that in the very next paragraph, A-4, a location is specified. In all of the statutes and rules that we cite in our brief, a location is specified. And so if there is not a location, that does not connote ambiguity. It connotes breadth. And the embassy is, in the words of Justice Kagan, something special. It is the extension of the foreign ministry in the United States. And so it is quite a modest step to say that that is an address at which service of process to the foreign minister is proper. Now, on the issue of policy, I think that the best response to your concern about policy, and I acknowledge that there was a default judgment in this case, though no one can dispute that Sudan had actual notice of this case and, of course, more than actual notice of the ongoing coal litigation which had been going on for many years. But even if you put that aside, the simple response to all of the policy considerations offered by my colleagues on the other side is that under A-3, it is completely within the control of the foreign State whether to accept A-3 service not only at its embassies, but more generally. And I would urge this Court to take a look at the policy of the United States, which we cite in our brief and we provide a correct website in our supplemental letter. It's a very brief document, which makes clear that not only does the United States not accept service at its embassies, it would not accept mail service even at the State Department. The sole ways in which the United States accepts service, if you look at page 2 of the current version of the policy, is either through diplomatic channels or through the Hague Service Convention, which is what A-2 refers to. All we are saying is that if this Court gives full effect to the language of subsection A-3, a country can adopt such a policy and implement such a policy. And if, for instance, some letter or package got inadvertently signed for, the country could send it back immediately. That is, of course, not what took place here. In all three of the lawsuits, Sudan signed the receipt. You can take a look at the Joint Appendix at page, I believe, 74, and see the return receipt for yourself. And so a country can avoid A-3 service if it so chooses, either altogether or at the embassies. Now, with regard to the practice of other countries, I would certainly acknowledge that A-3 is an unusual provision under any of our interpretations. Service of process by mail is not provided under the laws of many other countries. It is true that a number of countries do provide for service of process by mail on diplomatic personnel where it's a complaint against diplomatic personnel, and that is, of course, the upshot of the law in the U.K., as Lord Sumption discusses in paragraph 15 of his opinion. But I think that that illustrates why the government's interest in this case is unfounded. U.S. law has been nonreciprocal since the FSIA was enacted in 1976. U.S. law has permitted service of process by mail, where many other countries do not. And yet there is no evidence of some form of retaliation against the United States. And I think it is highly unlikely, with all due respect to the United States. The reason why I am is because you'll see what I'm going to say in a second. But I think that, yeah, maybe my purposing was – I'm not sure how overstated because I do worry about these small embassies. But text, you can't get me too far. I mean, it is ambiguous. But I still have the simple fact that every other country in the world has a different policy, and we did, too. And now you point out correctly that there are other ways that they could get to this same policy elsewhere in the statute, if they want to. And the problem is – and I mean this seriously, and I don't mean it to be facetious – Botswana, perhaps, does not have a lawyer like you. And to turn over to these countries, often very small, often without adequate legal advice, something that departs from a simple legal rule that every one of them has followed in one form or another in the past, is something that makes me nervous. Well, let me then offer a fourth answer, which is that you ought not to be nervous about that, because there are things that countries can do in your Botswana hypothetical. One thing they can do is, if the package gets transmitted to the foreign ministry and someone sees it and says, we should not have accepted service, it could be returned immediately. And applying ordinary principles of rescission, we're aware of at least one district court decision in which a court has said, well, you returned it right away, and so we're going to treat this as if service was not effective. But I think more importantly – and again, there is evidence of this in the lower court case law – if a country, after the fact, does not, in fact, transmit the service packet appropriately, the country can come in and object to any default or to a subsequent default judgment. But those are all subject to the discretion of the district court. They're not rules of – they're not absolute rules. But I think – What happens – I hate to use a country, but let's assume a country that's more than 24-hour mailing away, and they only have a pouch once a week. It gets to them. They send it back. It's now going to take whatever amount of time to come back. And the judge says, no, waiting a month, waiting six weeks is just too much time. That doesn't respect the dignitary expectations of all other States, including this one, of the United States, that that kind of service – For the record, I'm sure that Justice Breyer – I'm sure Justice Breyer did not intend to malign Botswana. No, no, no. Moreover, I know a very good lawyer in Botswana, actually. And I worked with her for quite a while. But the point is, I'm just taking that as a – it could be a totally wrong example. And what that is, is that there are many countries that don't have the resources to figure out what a default judgment means, to figure out where they're going to go, and they – and to know who to transmit things to. And the chances are just much greater that the right authorities will get the piece of paper if you send it to the ministry, which is likely to be better staffed in their own country. I mean, perhaps. So I think you could still have the risk of the same problem under Petitioner's and the United States' interpretation, because after all, the practical reality is that it's not the foreign minister himself or herself who's going to be responding to this lawsuit. It's going to be the equivalent of our Office of Foreign Litigation. So there's going to be a routing issue regardless. The service packet has to get to the right place. But, Justice Sotomayor – Exactly what rule you would like us to apply. In your brief, you say it must be sent to a location that is likely to have a direct line of communication to the foreign minister. So would that apply to every consulate? Would it apply to the number two person in the embassy, the number three person in the embassy? They all have a direct line of communication. I think that the better view is that if it is an official address of the foreign ministry that is likely to have a direct line of communication, and I think Mr. Curran agrees that it has to be an official address, so a home address or other address would not qualify, I think that that would satisfy our standard. But I think that if this Court were concerned about that breadth, and I'll explain in a minute why the Court shouldn't be, it could draw a line around embassies, because embassies certainly perform the full panoply of functions of the foreign ministry. Counsel, we're concerned about the text. Mr. McAllen, can we back up? This is – we're talking about a question of personal jurisdiction. What is the basis of subject matter jurisdiction in these suits? So the basis for subject matter jurisdiction is the waiver of immunity, and in fact there is a Federal cause of action uniquely for victims of terror attacks against State sponsors of terrorism under Section 1605A. It is true that this issue of service goes to personal jurisdiction under, I believe, it's Section 1330B, and so this is a personal jurisdiction issue. I do want to say one last thing in response to Justice Alito before I forget, and that is that, you know, if the Court is concerned about consulates and U.N. missions, again, the Court could distinguish embassies on the ground that embassies perform a unique function, and of course a country could adopt a policy of not accepting service at its consulates or at the U.N. mission. As a practical matter, I don't think it's going to matter very much, and we did look at the case law, and I think we found around three cases where parties have attempted service at consulates or U.N. missions. I think the reason it wouldn't matter is that if there is an available address in the United States, i.e., the embassy, there's not going to be any need to attempt service on the consulate or on the U.N. mission in New York rather than in Washington D.C. And I do think that one factual point here fares emphasizing. This method of service was first attempted by my co-counsel, Mr. Hall, in the Rucks case in 2004. The reason that we attempted service at the embassy was for the simple reason that in 2004, Sudan was at the tail end of its civil war, and it was very hard even to find someone who would deliver a package to Khartoum with the requisite return receipt. And so this case really illustrates why this policy makes sense. It makes sense because the embassy is indeed the extension of the foreign ministry in the United States, and it can choose how it wants to process or transmit a service package when it is accepted. There's no requirement that it use a diplomatic pouch, and in 2018, there are faster ways of making the transmission.  Sotomayor, are you asking this to? Are you suggesting that the U.N. Embassy would be a place to affect service under the status quorum? I think it would satisfy our statutory text our statutory text argument, and I heard Justice Gorsuch turning to that. And let me address that directly. Yes. I would think textually, you have had a very difficult time drawing a line around embassies. I mean, you suggest we might do that. I suppose we can do just about anything. But textually, I don't see how you make that argument. I think consulates, trade offices, tourism offices that are part of the ministry would all be included, I would think, under your interpretation. Well, I think our textual argument is that at least the verb dispatched connotes some notion of expeditiousness and promptness, and we're all in agreement about the relevant dictionary definitions. And I think with an embassy ex ante, I think it is reasonable to think that it's going to get to the foreign minister because of the direct line of communication and because embassies are directly in communication with foreign ministries all the time. I'm positing all sorts of different kinds of entities that are also directly in communication with and responsible to ultimately the foreign minister. So I'm not sure textually how I wouldn't qualify. Well, I think it's just that it is less likely to arrive in an expeditious manner if you send it to a tourist office and the like. That may very well not be a component of the foreign ministry, and I think we're in agreement, again, that it has to be an official address of the foreign ministry at a minimum.  Second question, if I might. Sure. What do we do about the fourth subsection, which does specify diplomatic means? We address it to the Secretary of State. If we failed under three, you go to four. And four says then you send it to the Secretary of State here in Washington, the United States Secretary of State, and the Secretary will then use diplomatic means to get it to the appropriate folks. And when Congress speaks so clearly about the question of diplomatic means in one place, we tend to usually think it's excluded elsewhere. What do we do about that? Well, I don't think that that hurts us. And, in fact, I think that A4 helps us in numerous respects. The first is, of course, the plain text argument that there Congress specified a location for the initial delivery. I understand that argument. That's not my question. Yes. And I think to be sure, A4 is, you know, the fallback. It is potentially available in the Kumar case where the Fourth Circuit rejected our interpretation. We're in the process of attempting service right now under A4 and working with the State Department to do that. And the way that A4 service operates is that you deliver the service packet first to the Secretary of State. Interestingly, and somewhat responsive to Mr. Curran's point, you know, the Secretary of State has a lot of buildings, even in Washington, D.C., and the State Department on its website. All right, all right. Now let's get to the question, all right? Well, I'm not meaning to filibuster. I just want to make sure that the Court understands how this actually operates. We understand that the State Department is large. My question is just, it speaks there that the Secretary will then use diplomatic means to get the service effected. Correct. And there is an express discussion of diplomatic means. Correct. And its presence in 4 would suggest its absence in 3 was not accidental. Under our normal canons of interpretation. Now, I'm telling you something you already know. So what's the answer to it? That's a somewhat different argument, I think, from the arguments that Sudan and the United States have made. And so let me address it directly. Let's say I disagree with that. Yes. So I don't think that the reference to diplomatic channels in any way excludes service at diplomatic premises. And that's for the simple reason that I think diplomatic channels has a very well-defined meaning at law. And if you take a look at. But your reading of 3 is that it has to get to the Foreign Minister. And the only way it can get to the Foreign Minister, you say, it will happen effectively and with great dispatch if I give it to the embassy and maybe a few other places. So you are using diplomatic means there, aren't you? Well, we are. I would hesitate to say that we're using diplomatic means other than in the very generic sense, Justice Gorsuch, which is to say that in any form of A3 service, you know, you are going through the Foreign Ministry. The question is, how are you going through the Foreign Ministry? And indeed, if you take a look at the regulation, if you're interested in A4, I think the government's own regulation is quite informative. It's 22 CFR 93.1. It's cited in the briefs. And it's. You're counting on A3 that the embassy is going to send it through a diplomatic pouch or otherwise to the Foreign Ministry, right? Or some other means. But again, diplomatic channels, it's a defined term and it refers to communication from one sovereign to the other. You know, that is what diplomatic channels means. And so if you look at the relevant regulation, it sets out the various ways in which that occurs. And it is certainly true, as Ms. Ross said, that the the probably the most common way this occurs is that the State Department sends a service packet to the United States Embassy in Khartoum and it attempts to deliver the service packet. As a practical matter, as a practical matter, is that hard to accomplish? In other words, the system going forward, if we were to say you can't do it at embassies, is there a problem going under that mechanism? Well, you know, the problem is that I don't think it's necessarily certain that you'll be able to attain service. We're certainly hopeful that we will be able to attain service under A4 in the Kumar case. But again, you know, this Court has to give effect to Congress's judgment. Are you aware of any problems trying to effectuate service generally under A4? Well, I think it could break down if there is not. It could. If there's not a diplomatic relationship. I mean, that's the bottom line, right, is that if there is not a diplomatic relationship, there are not going to be diplomatic channels. But I think tellingly, the regulation for A4 service contemplates the possibility of service of process at the embassy in the United States of the foreign State, which I think belies the notion that this is somehow forbidden by the Vienna Convention. In your research, did you find a single example, any example of someone tried A4 and they couldn't get it done? I'm not aware of an example. I can't say that I've actually researched that specific question. But of course, we're interpreting, above all, a Federal statute here. And Congress established a hierarchy. And, Justice Breyer, to the extent that A3 is unusual, I think the telling fact is that Congress preferred A3 service to A4 service. Breyer, I thought it was usual. My point, which you seem to agree with, is the research shows it's not, oh, the A3 you mean to the embassy is usual. Well. Unusual, unusual. No. I took your question to be whether I'm aware of any cases of A4 service failing so that a party is completely out of luck. That's right. And I think that if there would be such a case, it would be in a context in which the United States has no diplomatic relations and, therefore, there are no diplomatic channels. And, of course, that's not an unlikely possibility in the event of a State sponsor of terrorism, which is, after all, the context in which A3 is most likely to be subjected  How many of them have embassies in the United States where there's no diplomatic relations? Well, I think that that is, you know, to be fair, an unusual situation. And it certainly is true that with any luck, one of these mechanisms is going to succeed. And A4 does exist as a fallback. Of course, our whole point about the inequity. Counsel, the point you're making is it's not a big deal to allow service at an embassy even though the United States objects and even though, as Justice Breyer points out, no other country appears to allow that. And my response, in addition to that, is, is it really a big deal to, from your perspective, going forward, I know about this case, but going forward as a system to go through the A4 mechanism rather than A3 at an embassy? Well, I would flip that around and say that it's not a big deal to permit service on the embassy under A3. Precisely because a country can adopt a policy and simply decide not to accept A3 service. But if I were starting afresh, like the Chief Justice's first question, I might agree with you, but the United States and all the countries in the Vienna Convention all seem to say, actually, it is a big deal. But I think that there are two separate questions. The first is, does the Vienna Convention prohibit service of process by mail? And there I would respectfully submit that all of the relevant indicia, the language of Article 22, the drafting history, the commentary, including the U.K. Supreme Court's decision in Reyes, point in our favor. The second is, what is the current practice of other countries? And while it is certainly true that A3 is unusual with regard to lawsuits against foreign sovereigns, I don't think that it's as unusual with regard to lawsuits against diplomatic personnel like the lawsuit at issue in Reyes. So the idea of service of process by mail is not somehow alien. It's just that Congress, in adopting A3, did do something a little bit unusual in providing a mechanism for service of process by mail, even for litigation against foreign sovereigns. Alito, what would be the consequences in this particular case if you had to go back and if we were to rule against you and you succeed in achieving service under A4, is there any indication that Sudan would appear? Well, I think that's a question for Mr. Curran, but we would certainly have to start over in this case. And I think that the reason why that is particularly inequitable here is because in this case, we would essentially be held to have failed to serve properly by failing to comply with a requirement that does not appear on the face of the statute and in a context in which Sudan unquestionably had actual notice of the litigation. And, again, as this case comes to the Court, it comes to the Court on the assumption that Sudan accepted service here, notwithstanding Sudan's late effort to cast doubt on that proposition. And so notwithstanding Sudan's judgment to accept service under A3, we would have to start over at this late phase. And we're not even talking about an objection that was raised in the underlying litigation. We're talking about an objection that was raised in the very last at the very last minute in response to turnover orders, and that would be the height of unfairness to the coal victims. The judgment of the Second Circuit should be affirmed. Thank you, counsel. You have two minutes remaining, Mr. Curran. Justice Alito, Sudan is committed to appearing and defending itself. It believes that the default judgment was ill-founded. It has substantial defenses, and it would like to contest the charges. Is there you want to suggest that the government of Sudan had forgotten about the coal incident or didn't realize that this litigation was going on? It didn't get notice? It didn't know that this litigation was going on? Well, we do have a bona fide concern about the way the service package was sent, right? Page A75 of the Joint Appendix is the Postal Service record, and it shows that the embassy, but in fact was delivered to the embassy. But that's not the question. The question is did Sudan have actual notice. Mr. Shammugam said a few times it did. And you're not contesting that in fact Sudan had notice? We can't contest that someone at the embassy knew about the case through plaintiff's counsel. We have no idea whether responsible people in Khartoum knew about the litigation. Do they know about it before the 60-day period for replying and preventing the default judgment passed? I don't know, and there's nothing in the record on that. But again, actual notice. Well, you know that they knew as of when. The process was mailed. They have to return it. Sixty days later, they're eligible for a default, and default was entered. Okay? Yes. Now, do we know when they really knew about it? Before the default or after the default? I think it was after the motion for default judgment, but before the default judgment itself. Okay? That's my assessment of the record. My colleague, Mr. Shanmugam, advocates a reading of 1608A3 that is broad and unpredictable and leaves too much creativity for plaintiffs and courts. Thank you, counsel. The case is submitted.